UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                                           :
UNITED STATES OF AMERICA,                                  :     **MEMORANDUM**
                                                           :     **DECISION AND ORDER**
                                                           :
          - against -                                      :     18-cr-302 (BMC)
                                                           :
YUAN LI,                                                   :
                                                           :
                         Defendant.                        :
                                                           :
---------------------------------------------------------- X

**COGAN**, District Judge.

Defendant Yuan "Mike" Li was convicted of extortion conspiracy, in violation of 18

U.S.C. § 1951(a) (Count II); and for aiding and abetting another individual to threaten physical

violence in furtherance of a plan to commit extortion, in violation of the same statute (Count III).

He was acquitted of possession with intent to distribute methamphetamine (Count I) and

attempted extortion (Count IV).  He has moved under Fed. R. Crim. P. 29 and 33 for a judgment

of acquittal, or in the alternative, a new trial, for the following reasons:

1.  There was insufficient evidence presented at trial to support his convictions;

2.  An aiding and abetting instruction should not have been provided;

3.  The jury returned inconsistent verdicts;

4.  The verdicts violated the Fifth Amendment's Double Jeopardy Clause;

5.  The Government manufactured federal jurisdiction;

6.  The drug count should have been severed from the extortion counts;

7.  The Court erred in making several evidentiary rulings;

8.  A transcript with inaccurate information was provided to the jury;

9. Injustice requires a new trial;

10. The Government failed to disclose exculpatory information; and

11. He received ineffective assistance of counsel.

None of these arguments have merit and the motion is therefore denied.

## BACKGROUND

This case arises from defendant's association with a character named Anthony Pineda. Pineda ran an illegal gambling parlor out of a basement in Flushing, Queens. According to a Government witness and Pineda's ex-girlfriend, Joung Hwa Yun, Pineda also used his establishment to sell meth to many individuals, including Li. Whenever Li purchased large amounts of meth, Pineda instructed Yun to simply give Li the drugs first without collecting payment. Even though Li would always pay for the drugs later, Yun nonetheless described this arrangement as not typical.

The relationship between Pineda and Li did not end there. Li was also a regular gambler at Pineda's store, and he frequently borrowed money from Pineda to continue gambling. The two would also play games together at another illegal gambling parlor.

Immediately above Pineda's store was another competing gambling parlor, run by a man named Liu "Tony" Yi, the extortion victim in this case. Tony testified that Pineda initially sent him a message through one of Pineda's employees, Jackie. While the victim was in his store, Jackie came in and said that Pineda wanted Tony to give him 10% of the gambling parlor's proceeds on a monthly basis. The victim knew that Jackie was there on Pineda's behalf because Jackie said so, and the victim also recognized him as one of Pineda's subordinates. Around two weeks later, Jackie returned and made a veiled threat: "If you give [Pineda] that 10 percent you are going to have a lot less problems in the future."

This scared Tony.  He was well aware of Pineda's reputation in the Flushing community as a man with a "very hot temper" and someone who was heavily involved in the drug trade.  He had heard of at least two instances in which Pineda had viciously "beaten up" others and that Pineda sold crystal meth out of his gambling parlor.

Another reason Tony was concerned was because he knew Pineda had many subordinates who worked for him.  Based on part of this reputation, Tony testified that he was afraid of Pineda and believed that harm would come to him or his store if he did not give into these demands.

Pineda's intent to commit extortion was obvious.  He was recorded by an FBI confidential source boasting that, if Tony did not pay this monthly fee, Tony would have to close his store or incur Pineda's wrath: "I should have f----- them up last night … . They don't understand … [t]here really is no negotiation, my n----.  If there – if it's a no, then they better close that m-----f------ store, n----.  Cause I'm gonna be whooping n----."

Li became aware of Pineda's threat of physical violence in furtherance of a plan to commit extortion when he agreed to interpret a conversation between Pineda and Tony on September 28, 2017.  On that date, Tony went downstairs to Pineda's store and asked to speak directly with Pineda, who walked out to greet him.  Li came out a few seconds later.  Tony testified that this interaction took place near a stairwell and that Li acted as a translator for the two.  Pineda spoke English and he did not speak Chinese; on the other hand, Tony spoke Mandarin Chinese and very little English.  Li spoke both languages pretty well.

After the three exchanged pleasantries, things got down to business.  Tony bluntly asked what would happen if he refused Pineda's demand for 10% of his store's revenue.  Pineda's English response, as translated by Li into Chinese, was unmistakable: the two could either be "friends or enemies."  The victim was still unsure how to react, so Pineda reached underneath his

3

shirt and took out a handgun, waved the gun back and forth, and repeated the "friends or enemies" comment.  Li then placed his hand on Tony and said to him, "why don't you give it to him, why don't you give it to him, it's not necessary to have all of these problems."  Because the victim declined to give a definitive answer, Pineda ultimately became frustrated and – while holding the gun – told the victim in a loud and mean tone to "get out."

Li's culpability arising from Pineda's threat of physical violence under an aiding and abetting theory was confirmed at the next day's meeting (the "September 29 meeting").  After Tony was threatened with a gun, he contacted the FBI.  The FBI then wired him up and told him to schedule a second meeting with Pineda.  Tony did as he was instructed and went to Pineda's gambling parlor once more, this time wired by the FBI with a hidden camera.  This meeting took place in a private room in Pineda's store, and the entire interaction was captured on video with audio.  The jury could see that Li was present, along with Pineda and two others, and see and hear Li translating the conversation between Pineda and the victim.  In the video, the victim explicitly refers to – in Li's presence – the prior episode by the stairwell in which Pineda brandished a gun, confessing how this scared him.  Since Tony was speaking Mandarin Chinese, Li had to translate Tony's admission to the group.  Instead of expressing surprise or discomfort at this sudden accusation, Li proceeded to tell the group in English (and in a jovial tone): "All he knows is that you pulled out a gun."  Pineda's entourage, including Li, then burst into laughter.  The rest of the recording largely consists of Pineda and Li, along with others, trying to intimidate Tony to go along with the deal.

Most relevant for our purposes, Li is caught translating the following information to Tony at Pineda's behest: (1) that Pineda "wants to protect his own territory"; (2) that he "will not kill anyone"; (3) that this 10% would be a sign of respect from Tony and that Pineda is simply asking

for Tony "to give him face"; (4) that in order to operate his business, Tony must pay Pineda 10%

of his gambling parlor's proceeds on a regular basis; (5) that Pineda will make sure the victim's

store remains "safe" so long as he is given his cut; (6) that, prior to Tony opening up his store,

Pineda had forbidden others from opening up a gambling parlor above his; and (7) that if Tony

gives into Pineda's demands, this "would open up the future" for the two.  Significantly, when

the victim reiterated that all he wants is to make peace with Pineda, Li laughed.

Sometime after this meeting, Tony decided to close his store.  He testified that this was

based on his conversation with Pineda and concerns that his own gambling parlor was being used

to distribute drugs by Tony's business partner, a man named Brian White.

## DISCUSSION

### I.   Judgment of Acquittal

#### A.   Legal Sufficiency

Under Federal Rule of Criminal Procedure 29(c), "[i]f the jury has returned a guilty

verdict, the court may set aside and enter an acquittal."  "When a defendant moves for a

judgment of acquittal, the Court must determine whether upon the evidence, giving full play to

the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences

of fact, a reasonable mind might fairly conclude guilty beyond a reasonable doubt."  United

States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984).  "A reasonable mind must be able to

conclude guilt on each and every element of the charged offense."  Id.  "However, all reasonable

inferences are to be resolved in favor of the prosecution and the trial court is required to review

the evidence in the light most favorable to the Government with respect to each element of the

offense."  Id. (internal quotation marks omitted).  "The evidence is to be viewed not in isolation

but in conjunction."  Id. (internal quotation marks omitted).

Thus, a convicted defendant "bears a heavy burden" when challenging the sufficiency of the evidence.  United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017).  "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

### B.      Aiding and Abetting Conviction

Li challenges the sufficiency of the evidence as to his conviction for aiding and abetting the threatening of physical violence in furtherance of a plan to commit extortion.  Without citing any authority, Li advances the peculiar argument that "Li himself, must have been [sic] threatened physical violence" to be guilty as an aider and abetter.  This argument fails for two reasons.  First, had Li in fact threatened physicial violence in furtherance of a plan to commit extortion, he would have been guilty as a principal.  Second, this contention fails to appreciate that, under the operative superseding indictment, in addition to being charged as a principal, Li was also charged in the alternative as an aider and abetter under 18 U.S.C. § 2.  The statute provides that an aider and abetter may be punished as a principal.  See United States v. Shoreline Motors, 413 F. App'x 322, 326 (2d Cir. 2011).

The Hobbs Act provides that an individual commits a federal crime if he obstructs, delays, or affects commerce by robbery, extortion, or committing or threatening violence of any person or property in furtherance of a plan or purpose to do anything in violation of the Act.  See Scheidler v. Nat'l Org. for Women, Inc., 547 U.S. 9, 13 (2006).  A person is guilty as an aider and an abetter if he takes an affirmative act in furtherance of an offense, with the intent of facilitating the offense's commission.  Rosemond v. United States, 572 U.S. 65, 71 (2014).

6

Here, there was sufficient evidence to support a finding of guilt on Count III under an aider and abetter theory.  As to whether Pineda physically threatened the victim in a plan to extort him, the evidence was overwhelming.  Pineda's intent was apparent from his phone call with an FBI source, in which he boasted that, if Tony refused to give into his demands, his competitor "better close the m-----f------ store" or else face a "whooping."  Tony also testified that Jackie told Tony that he'd have "less problems in the future" if he simply accepted Pineda's terms.  From Tony's perspective, the "problems" to which Jackie was referring to was obvious: Pineda had a reputation for violence in the local community and thus Tony reasonably feared that harm would come either to him or his store if he refused.

In the event the threat of violence was not made obvious, Pineda dispelled any ambiguity during his first meeting with Tony, in which Pineda repeated his demands for 10% while brandishing a firearm and commenting that the two could either be "friends or enemies."  The jury could reasonably find beyond a reasonable doubt Pineda threatened the victim with physical violence, because at the second meeting, which was caught on tape, the victim accused Pineda of pulling a gun on him the day before.  Rather than deny the allegation, Pineda simply laughed once it was translated by Li, from which the jury could infer an admission of guilt.  See United States v. Flecha, 539 F.2d 874, 877 (2d Cir. 1976).  Under these facts, it is safe to say that a rational jury could have concluded that Pineda threatened physical violence against Tony in a scheme to extort him.

As to Li's attempt to characterize himself as an oblivious translator, this is belied by the evidence introduced at trial.  At the first meeting, after Pineda revealed a gun and made the "friends or enemies" comment in English, Li did not respond with shock or discomfort.  Rather, his immediate response was to emphasize Pineda's demand by placing a hand on Tony and

encouraging him to accept Pineda's terms, as it was "not necessary to have all these problems." In other words, without Li, Pineda's threats to Tony would have been less effective and credible.

Li's culpability under an aiding and abetting theory was further confirmed at the September 29 meeting, which the FBI was surreptitiously recording.  After Li entered the room, it was obvious that he did not need to be brought up to speed on what was going on.  What transpired was a classic shakedown  – and a jury could rationally find that Li knowingly participated and, by his words and actions, sought to make it succeed.

While Li was translating for Pineda and Tony, the victim revealed how Pineda brandished a firearm the day before while demanding 10% of his business's proceeds, an event that scared him.  Instead of conveying surprise or discomfort at this accusation – the expected reaction of an individual who had no interest in partaking in criminal behavior – Li's reaction was to immediately interpret Tony's concern to the group in a cheerful tone and burst into laughter with the rest of Pineda's entourage once he translated Tony's apprehension.  Despite this comment, Li continued to eagerly interpret for Pineda without expressing any level of discomfort or hesitation.

At no point during these meetings did Li ever try to talk Pineda out of his coercive offer or attempt to bring the parties to a compromise.  Nor did he ever seek clarification from Pineda as to any of his extortive statements.  Instead, Li was advocating for Pineda's position the entire time.  The jury could rationally conclude from this behavior that Li sought to capitalize on Tony's fear of Pineda, especially since Li repeatedly encouraged Tony to "show respect" to Pineda and told him that it was in his best interest to cut Pineda in.  The jury therefore had sufficient evidence to find that, based on Li's act of translating Pineda's veiled threats on both

8

instances and his unabashedly partisan behavior throughout the September 29 meeting, Li was fully aware of Pineda's plan to extort Tony and personally wanted Pineda's plan to succeed.

Although Li attempts to attribute his appearance at both meetings as mere coincidences, Li did not remove himself from the room once criminal activity was clearly afoot or attempt to contact law enforcement after the meeting.[1]  Instead he actively participated in the "negotiations."  In fact, to justify the arrangement, Li was the one who brought up the concept of "showing face" to Pineda.  The victim testified that this was a familiar saying in Chinese culture where one would show respect to a more powerful or superior individual, as a son would for a father.  This was presumably raised by Li to convince Tony that Pineda's demand should not be that difficult a pill to swallow.

Li also argues that he cannot be guilty under an aider and abetter theory because he did not stand to financially gain from the extortion of Tony, as none of the proceeds would have flowed to him.  However, the jury could rationally find that no express quid pro quo was required.  Li's behavior during the two meetings, in which he interpreted Pineda's demands without hesitation, observed Pineda pull a gun on the victim, laughed at the victim's predicament and desire for peace, and consistently encouraged Tony to pay Pineda, constituted substantial evidence from which a rational jury could find that Li wanted the criminal venture to succeed because of his pre-existing relationship with Pineda.

As revealed at trial, Pineda provided Li drugs in an unusual arrangement, was his frequent gambling buddy, and loaned money to Li so he could gamble at Pineda's establishment.

---

[1] To the extent Li attempts to raise a duress defense by asserting that he had expressed "discomfort with acting as a translator," this argument fails for two reasons: (1) Li failed to present any evidence as to the requisite elements of the defense, see United States v. Villegas, 899 F.2d 1324, 1343-44 (2d Cir. 1990); and (2) at no point during trial did Li ever suggest duress or request the relevant instruction.

In other words, the two were more than mere acquaintances.  See United States v. Ceballos, 605 F.3d 468, 470 (8th Cir. 2010) (affirming aiding and abetting conviction after the defendant translated two narcotics transactions for her paramour).  Thus, the circumstantial evidence showed that Li had a motive and interest to please Pineda and otherwise remain on his good side.  See United States v. Johnson, 513 F.2d 819, 823 (2d Cir. 1975) ("[T]o be an aider and abetter the defendant must associate himself with the venture in some fashion, participate in it as something that he wishes to bring about, or seek by his action to make it succeed.").[2]

Lastly, Li's argument that Tony was unreasonable to fear for his safety defies credulity.  During the first meeting, after the victim voiced some uncertainty, Pineda brandished a firearm, commenting that the two could either be "friends or enemies."  Once it became apparent that Tony was not going to make a decision at that moment – while holding the gun – Pineda told Tony to "get out" in a loud and angry tone.  Tony testified that this left him "scared" and that he believed his "safety was being threatened."  The very fact that he immediately reported this incident to the FBI, at the expense of revealing his own illicit activities, demonstrated that Tony perceived this as a serious and credible threat.

## C.     Extortion Conspiracy Count

For similar reasons, there was sufficient evidence from which a rational jury could find that Li was guilty for conspiring with Pineda to commit extortion.  To establish a Hobbs Act conspiracy, the Government need only prove that an agreement to commit extortion existed, not that extortion was actually committed.  See United States v. Clemente, 22 F.3d 477, 481 (2d Cir. 1994).  It need not present evidence of "a formal or express agreement, but may rely on proof

---

[2] Since Li was convicted under the alternative aider and abetter theory, it is irrelevant that he was not the individual who actually threatened physical violence in furtherance of a plan to extort Tony.  If he did, he would be guilty as a principal.  But to be found guilty as an aider and abetter, one need only take an affirmative act in furtherance of the offense, with the intent of facilitating Pineda's commission of the offense.  See 18 U.S.C. § 2.

that the parties have a tacit understanding to engage in the offense."  United States v. Weiner,

152 F. App'x 38, 40 (2d Cir. 2005).

When considering whether substantial evidence exists to support a verdict, this

deferential standard is "especially important when reviewing a conviction of conspiracy."

United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992).  "This is so because a conspiracy by

its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can

be laid bare in court with the precision of a surgeon's scalpel."  Id. (internal quotation marks

omitted).  Accordingly, the existence of and participation in a conspiracy may be established

through circumstantial evidence.  Id.  There must be some evidence, however, from which it can

reasonably be inferred that the defendant "knew of the existence of the scheme alleged in the

indictment and knowingly joined and participated in it."  United States v. Gaviria, 740 F.2d 174,

183 (2d Cir. 1984).  The evidence showed more than Li's mere presence and was therefore

sufficient to sustain Li's conspiracy conviction.

The evidence a trial revealed that, contrary to Li's contention, he was not just a random

acquaintance of Pineda's who happened to be at the wrong place at the wrong time.  Instead,

Pineda would provide Li with substantial quantities of meth without requiring payment upon

delivery, which was abnormal, and the two were essentially gambling buddies.  This established

relationship demonstrated that the two shared a certain level of trust, and thus a jury could

rationally infer that Pineda was comfortable enough with Li to share with him his plan to extort

Tony when asking Li to translate for him at the stairwell.   The jury had ample reason to reject

Li's argument that he was never part of a conspiracy to extort Tony.

D.     **Aiding and Abetting Instruction**

Li also contends that the Court erred by providing an aiding and abetting instruction as to Count III.  He claims that the operative superseding indictment gave no indication that the Government was pursuing this alternative theory at trial.  Neither the law nor the record supports this argument.

"The well established rule in this and other Circuits is that a defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor."  United States v. Nyenekor, 784 F. App'x 810, 816 (2d Cir. 2019) (quoting United States v. Smith, 727 F.2d 214, 217 (2d Cir. 1984)).  Therefore, providing "an aiding and abetting jury instruction is appropriate where the prosecution makes it known that it intends to proceed on a theory of aiding and abetting and the evidence so warrants."  Id. (quoting Smith, 727 F.2d at 217); see also Virella v. United States, 750 F. Supp. 111, 115 (S.D.N.Y. 1990) ("Indeed, in view of the language of the statute, all indictments for substantive offenses must be read as if the alternative provided by 18 U.S.C. § 2 were embodied in the indictment.").

Here, the indictment provided ample notice that the Government was pursuing an alternative aiding and abetting theory under Count III.  The Fifth Superseding Indictment tracked the relevant language of 18 U.S.C. § 1951(a), cited the statute, and explicitly referred to the aiding and abetting statute, 18 U.S.C. § 2.  Further, a week before trial, pursuant to the Court's order, both sides provided the Court with draft jury instructions, in which the Government specifically requested an aiding and abetting instruction as to Count III.

This was more than adequate notice.  See Nyenekor, 784 F. App'x at 816 (raising the issue on the second day of trial before the defense's case began suffices at timely).  At no point during trial did defendant ever raised an objection to this instruction or seek a continuance.  In

fact, after charging the jury but before sending it back to deliberate, I held a sidebar with the parties, inquiring whether there was any instruction that needed to "be repaired." With the exception of one unrelated issue,[3] the defense did not otherwise take me up on my offer. Since the Government presented sufficient evidence justifying an aiding and abetting instruction, there was no reason not to provide one in this case.[4]

### E.    Inconsistent Verdicts

Because the jury acquitted Li of attempted extortion, Li argues that the jury improperly concluded that he conspired with others to commit extortion or aided and abetted a substantive Hobbs Act violation. This contention overlooks several fundamental tenets of criminal law.

"It is black-letter law that the inconsistency among verdicts does not support vacatur under Rule 29." United States v. Mack, No. 18-cr-834, 2020 WL 114509, at *5 (S.D.N.Y. Jan. 10, 2020). The Second Circuit has emphasized that, when reviewing the sufficiency of the evidence, "jury verdicts are not to be reviewed for consistency," and that any review of sufficiency is to be performed "independently for each count, ignoring the jury's determination that evidence on another count was insufficient." United States v. Maracle, 282 F. App'x 891, 893 (2d Cir. 2008); see also United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994) ("it has been long established that inconsistency in jury verdicts of guilty on some counts and not guilty

---

[3] The defense requested I qualify the instruction that witnesses were equally available or unavailable to both sides. Defendant requested that, and I agreed to, inform the jury that defendant, unlike the Government, did not have the ability to grant any witness immunity and compel their testimony.

[4] Li contends that Count III cannot be prosecuted under an aiding and abetting theory. But he offers no authority for such a novel proposition and ignores 18 U.S.C. § 2. Further, his argument that he "cannot be both the principal and accessory since he cannot aid and abet himself" fails to comprehend that the Government submitted alternative theories as to Count III, and that – under the convicted aiding and abetting theory – Pineda was the principal whom Li assisted. The Government was neither required to prosecute nor obtain Pineda's conviction as a principal to convict Li as a aider and abetter so long as it proved that Pineda committed the substantive offense. See United States v. Ruffin, 613 F.2d 408, 412 (2d Cir. 1979); United States v. Syjuco, No. 12-cr-37, 2013 WL 12218388, at *2 (C.D. Cal. Oct. 22, 2013).

on others is not a ground for reversal of the verdicts of guilty.").  This is because the Supreme

Court has concluded

> [i]nconsistent verdicts – even verdicts that acquit on a predicate offense while convicting on the compound offense – should not necessarily be interpreted as a windfall to the Government at the defendant's expense.  It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and even through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

United States v. Powell, 469 U.S. 57, 65 (1984); see also United States v. Zane, 495 F.2d 683,

690 (2d Cir. 1974) ("The validity accorded to [inconsistent] verdicts recognizes the sancity of the

jury's deliberations and the strong policy against probing into its logic or reasoning, which

would open the door to interminable speculation.").

     Li erroneously assumes that the only reason the jury acquitted him of the attempted

extortion (Count IV) was because it concluded the elements of the offense had not been proven.

He fails to appreciate the likelihood that the jury returned such a verdict because, in Count III, it

had just found him guilty of the substantive crime of threatening violence in furtherance of a plan

or purpose to engage in extortion and thus believed a conviction on the attempt count would be

overkill.  In other words, the jury's verdict was entirely consistent with the merger doctrine, in

which "an attempt to commit a substantive crime merges upon conviction of the substantive

offense."  See United States v. Moss, 562 F.2d 155, 159 (2d Cir. 1977).

     In fact, had the jury returned guilty verdicts on both the substantive Hobbs Act violation

and the attempted extortion count, I would have vacated one before sentencing.  "[T]he [Hobbs

Act] Amendments dealt with attempt and substantive offenses in separate paragraphs, even

though a defendant cannot be convicted of both attempts and a substantive offense, let alone

punished for both."  United States v. Bicaksiz, 194 F.3d 390, 395 n.7 (2d Cir. 1999).  As I

discuss further below, sentencing Li on both Counts III and IV, for essentially the same conduct,

14

"would violate double jeopardy by punishing the offender twice for what was designed by Congress to be a single unit of prosecution." United States v. Walker, 314 F. Supp. 3d 400, 409 (E.D.N.Y. 2018) ("Hobbs Act Robbery is indivisible; it may be committed through multiple alternative means, robbery or violence in furtherance of a plan to commit robbery, but always as part of a single element. Thus, violence in furtherance of Hobbs Act Robbery necessarily requires proof of the same elements as Hobbs Act Robbery.").

If a defendant cannot be convicted for both Hobbs Act extortion and attempted extortion, then it must logically follow that the same prohibition applies when a defendant is convicted of violence in furtherance of Hobbs Act extortion and attempted extortion. Here, the jury simply applied common sense in coming out the way it did, thereby obviating any need for the Court to interject itself into the matter.

**F.   Double Jeopardy Clause**

In the same vein, defendant's related argument – that presenting both Counts III and IV to the jury violated his Double Jeopardy rights – also fails. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999). Such an indictment raises constitutional concerns, as the Double Jeopardy Clause protects a defendant "against cumulative punishments for convictions on the same offense." Ohio v. Johnson, 467 U.S. 493, 500 (1984). Put differently, "the principle danger created by multiplicity is that a defendant will receive multiple punishment for a single offense." United States v. Colton, 231 F.3d 890, 910 (4th Cir. 2000).

However, the Double Jeopardy Clause "does not prohibit the State from prosecuting [a defendant] for such multiple offenses in a single prosecution." Johnson, 467 U.S. at 500.

15

Rather, so long as "the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment." United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006).  In the event that "the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicious counts." Id.

Here, the jury acquitted defendant of Count IV, the purportedly multiplicitous count, and he therefore has no basis to fear multiple punishment.  For the same reason, instructing the jury to consider Counts I and IV also did not violate his rights.

As to the two counts of conviction, there is of course no double jeopardy concerns. Conspiracy to commit a Hobbs Act violation and aiding and abetting a substantive violation are "separate convictions for which separate punishments may be imposed."  Bicaksiz, 194 F.3d at 396; see also Lorenzana v. United States, No. 11-cv-6153, 2012 WL 4462006, at *5 (S.D.N.Y. Sept. 27, 2012) ("The Constitution's Double Jeopardy Clause does not bar charging and sentencing a defendant as to both substantive and conspiracy counts of the Hobbs Act."); Virella, 750 F. Supp. at 116 ("Conspiracy to commit a substantive offense and aiding and abetting the commission of the same offense constitute separate and distinct crimes and the Double Jeopardy Clause poses no bar to defendant's conviction of both where the conspiracy and substantive counts require proof of different elements.") (internal quotation marks and citation omitted).

### G.    Manufactured Jurisdiction

The Hobbs Act makes it unlawful "in any way or degree" to obstruct, delay, or affect "commerce or the movement of any article or commodity in commerce, by robbery or extortion[.]". 18 U.S.C. § 1951(a).  The requirement that the criminal act affect interstate

16

commerce is an element of the offense charged and jurisdictionally "critical" because federal jurisdiction rests on interference with interstate commerce. Stirone v. United States, 361 U.S. 212, 218 (1960). The Government's burden, however, in proving a nexus to interstate commerce is minimal. United States v. Shareef, 190 F.3d 71, 75 (2d Cir. 1999). The Act "regulates activities which, in the aggregate, have a substantial effect on interstate commerce; hence, the 'de minimis character of individual instances arising under [the] statute is of no consequence.'" United States v. Elias, 285 F.3d 183, 188 (2d Cir. 2002) (quoting United States v. Leslie, 103 F.3d 1093, 1100 (2d Cir. 1997).

The Second Circuit has identified four circumstances in which the interstate commerce element is satisfied when the defendant's target is an individual instead of a business: (i) where the victim directly participated in interstate commerce; (ii) where the defendant targeted the victim because of his status as an employee at a company participating in interstate commerce; (iii) where the assets of a company engaged in interstate commerce were, or would have been, depleted as a result of the harm or potential harm, respectively, to the individual; or (iv) where the defendant targeted the assets of a business engaged in interstate commerce rather than an individual. United States v. Wilkerson, 361 F.3d 717, 729 (2d Cir. 2004).

In the instant case, the nexus to interstate commerce was easily satisfied. The victim testified that he regularly bought soda and cigarettes and that he provided them to his gambling patrons for free; that Pineda demanded 10% of the proceeds from his store; and that, after the extortion attempt, he decided to close his business. The representatives from Coca-Cola and Marlboro testified that their products were manufactured out of state. The jury could therefore rationally find that defendant's actions affected interstate commerce because Tony closed his gambling parlor after he was threatened and because defendant targeted the assets of a business

engaged in interstate commerce.[5]  See United States v. Harris, 712 F. App'x 108, 110 (2d Cir. 2018) ("the government may establish an interstate nexus by introducing evidence that the robbery was of a business that purchases commodities that travel in interstate commerce.").

### H.      Severance of the charges

A defendant seeking severance under Fed. R. Crim. P. 14 must show that he would suffer substantial prejudice from a denial of such relief.  United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980).  The Second Circuit has emphasized that "the decision whether to grant a severance is committed to the sound discretion of the trial court and is virtually unreviewable." United States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993).  This standard presents an "extremely difficult burden" for the defendant to overcome.  Id.

Li claims the drug charge should have been severed from the remaining counts due to the "prejudicial spillover" resulting from a single trial.  I disagree.  Li's instant motion, in which he argues that he was merely present at Pineda's gambling parlor to conduct renovations and was used an as innocent agent by Pineda to translate for him, demonstrates why evidence related to the drug count was not only admissible – but essential – to prove the remaining counts under Fed. R. Evid. 404(b).  If the jury did not hear about the illicit and extensive relationship between the two, it may very well have accepted the defense theory that Li was a gullible figure, who just happened to be in the wrong place at the wrong time and found himself inadvertently looped into a venture he wanted no part of.

The evidence, however, that Pineda was Li's drug supplier and would regularly provide him substantial amounts of meth without requiring advance payment, which was not typical,

---

[5] In makes no difference that the victim gave away these products for free.  Tony and his business were engaged in interstate commerce when they purchased the soda and cigarettes, and thus the flow of these items was affected by the closure of Tony's store and, alternatively, could have been affected if Tony simply decided to surrender 10% of his monthly revenue to Pineda.

provided essential context for the extortion allegations for two reasons.  First, it established the profound level of trust between the two, and thus the jury could infer that Pineda would have felt comfortable enough to reveal to Li the essential elements of the scheme to extort Tony before asking Li to translate for him.  And, second, it offered the jury an explanation as to Li's personal motive and interest to want Pineda's plan to succeed.  See Fed. R. Evid. 404(b).  Why else would Li so willingly and eagerly interpret Pineda's coercive demands and laugh at Tony's comment about Pineda brandishing a gun, but to preserve his personal relationship with Pineda?  In other words, Li had every reason to please his drug dealer, less he risk jeopardizing the favorable treatment he was receiving when purchasing meth.  Since the evidence for the drug count was admissible to prove the remaining counts, there was no basis to sever the charges.  See Zackson, 6 F.3d at 922 (denial of severance upheld because defendant failed to show "substantial prejudice" where there was a "likelihood that evidence of both crimes would be admissible at separate trials").

In any event, there is a far more compelling reason to deny Li any relief for this basis. The Second Circuit has recognized that prejudice warranting a new trial cannot be shown where, as was the case here, the jury's split verdict reflects careful consideration of proof as to each individual count.  See United States v. Hamilton, 334 F.3d 170, 183 (2d Cir. 2003).  "The absence of such spillover" is "readily inferable where the jury has convicted a defendant on some counts but not on others."  Id.; see also United States v. Morales, 185 F.3d 74, 83 (2d Cir. 1999) ("Partial acquittal of a defendant strongly indicates that there was no prejudicial spillover.").

Li also argues that the joinder of charges deprived him of the opportunity to testify as to the extortion counts.  It is well-settled that "a mere unexplicated assertion of the desire to testify on only one count is not enough to require severance."  United States v. Sampson, 385 F.3d 183,

191 (2d Cir. 2004) (internal quotation marks omitted).  Specifically, the defendant bears the
burden to show he has important testimony to give on one count and a need to refrain from
giving testimony on another.  Id.  Li neither advances any reasoned argument on this issue nor
explains to the Court the nature of the testimony he wished to give.  See, e.g., United States v.
Richardson, 515 F.3d 74, 81 (1st Cir. 2008); Werner, 620, F.2d at 930.

## I.    Evidentiary Rulings

Li disagrees with three evidentiary rulings made by the Court.  He challenges the Court's
admission of (1) wiretap calls and messages between Pineda and others regarding Pineda's drug
dealing operation, (2) evidence of Pineda's gambling parlor, and (3) the September 27, 2017
recorded phone call between Pineda and an FBI confidential source.

The calls and text messages between Pineda and others were properly admitted into
evidence.  Li spends a great deal of space in his brief arguing why Pineda's words were not a co-
conspirator's statements, but he entirely overlooks that in its *in limine* ruling, the Court also
admitted this evidence under an alternative theory: a declaration against interest.  Federal Rule of
Evidence 804(b)(3) permits a hearsay statement to be admitted if: (1) the declarant is unavailable
as a witness; (2) the statement is so contrary to the declarant's proprietary or pecuniary interest
or has so great a tendency to expose the declarant to civil or criminal liability that a reasonable
person in the declarant's position would have made the statement only if the person believed it to
be true; and (3) the statement is supported by corroborating circumstances that clearly indicate its
trustworthiness.  See United States v. Miller, 954 F.3d 551, 560-61 (2d Cir. 2020) (internal
quotation marks and citation omitted).

Here, the conversations at issue squarely fell into this hearsay exception.  It is undisputed
that Pineda was unavailable at trial since his counsel represented to the Government that, if

called to testify at Li's trial, Pineda would invoke his Fifth Amendment right against self-incrimination.  Under these circumstances, a witness is categorically unavailable for the purposes of Fed. R. Evid. 804(a).  See id. at 561.  Pineda's statements were also against his penal interest because a reasonable person in his shoes would realize that implicating oneself in a massive drug conspiracy and plan to extort one's competitor could easily lead to criminal prosecution.  Lastly, the statements themselves were supported by corroborating circumstances indicating their trustworthiness.  Pineda was unaware that he was being recorded by law enforcement and had no reason to lie when he openly implicated himself in various criminal misdeeds.  See United States v. Bryce, 208 F.3d 346, 351 (2d Cir. 1999).  And his statements were neither made under coercive circumstances, see United States v. Matthews, 20 F.3d 538, 546 (2d Cir. 1994), nor were they meant to shift blame or curry favor with authorities, see Williamson v. United States, 512 U.S. 594, 603 (1994).  Furthermore, the evidence at trial largely corroborated Pineda's damning statements: his ex-girlfriend testified that he dealt drugs out of his gambling parlor and his subsequent attempt to extort Tony was recorded by the FBI.

Li's contention that these statements were inadmissible against him because his name was never mentioned during the conversations fails.  There is no such requirement under Fed. R. Evid. 804(b)(3), and thus this argument went to the exhibits' weight, not their admissibility.

As to whether this evidence was relevant under Fed. R. Evid. 401 and admissible under Fed. R. Evid. 404(b), defendant again fails to appreciate the Government's multiple theories of admissibility at trial.  These exhibits served as direct evidence of, and were thus inextricably intertwined with the drug and extortion charges against Li.  Specifically, since Li was also charged with possession with the intent to distribute meth, the evidence as to Pineda's drug operation suggested that he actually had the means and ability to supply drugs to Li in the

amount alleged at trial.  This corroborated the testimony of Ms. Yun, who testified that, on at least three occasions, Pineda gave Li significant amounts of meth without requiring him to pay upfront, which she testified was not normal.  Further, the fact that Pineda partially owned the downstairs gambling parlor was relevant to show his motive to extort Tony.  Pineda believed that Tony's upstairs gambling parlor was siphoning customers away from his own illegal business.

Li also argues the Court erred in admitting the ITACC recording.  To recap, this call was between Pineda and an FBI confidential source where the two discuss Pineda's plan to extort Tony and the consequences for Tony if he refused to pay.[6]  Li's argument has two aspects: (1) the exhibit was double hearsay; and (2) the Government did not authenticate the exhibit.

As to the first argument, the Government satisfied both layers of hearsay exceptions.  As I stated above, Pineda's statements were admissible as statements made against his penal interest.  See Fed. R. Evid. 804(b)(3).  The second layer of hearsay was overcome because the recording was admissible as a business record under Fed. R. Evid. 803(6).

To satisfy this particular hearsay exception, the Government called FBI Special Agent Chan to lay the foundation for the exhibit.  His testimony supported the following: (i) that the recording was made at or near the time by someone with knowledge (i.e., the confidential source); (ii) that the record was kept in the course of a regularly conducted activity of the organization (i.e., the FBI's ITACC Automated Database); (iii) that making the record was a regular practice of the FBI (i.e., the system is widely used by the FBI for investigation purposes); and (iv) that he was a proper custodian or qualified witness capable of showing these conditions (i.e., he was one of the case agents for this investigation and personally made a copy of the recording).  His testimony about the date, time, and participants to the call – which were

---

[6] ITACC is an acronym for an FBI system used to record phone calls made by FBI confidential sources.

recorded by the automated ITACC system – was no different to that of a witness laying the

foundation of a 911 emergency phone call.  Such calls are regularly admitted into evidence as

business records.  See, e.g., United States v. Suggs, 266 F. App'x 258, 262 (4th Cir. 2008);

United States v. Chen Kuo, No. 10-cr-671, 2011 WL 145471, at *11 (E.D.N.Y. Jan. 18, 2011).

  Li claims the witness did not testify whether there were any changes, additions, or

deletions to the recording and that there was no chain of custody testimony about when and how

the file was transferred from the ITACC system to the recording admitted at trial.  This challenge

to the exhibit's authenticity is equally unconvincing because they are largely belied by the

record.  SA Chan in fact testified that he obtained a copy of the phone call at issue from the

ITACC system and that the recording was a "true and accurate copy of the recording."  Since the

witness was able to adequately lay the foundation for the exhibit, any further dispute over the

recording's reliability went to its weight, rather than its admissibility.  See United States v.

Guang, 511 F.3d 110, 120 (2d Cir. 2007); see also United States v. Credico, 217 F. Supp. 3d 825,

827-80 (E.D. Pa. 2016), aff'd, 718 F. App'x 116 (3d Cir. 2017) (admitting ITACC recordings

even when there was no log to memorialize the chain of custody and the defendant's expert was

unable to analyze the original recordings due to the Government's mishandling of them).

  If Li had any genuine concerns of the exhibit's reliability, he could have hired an expert

witness to review the recording well before trial and testify as to any relevant findings.  He did

not.  Even now, without any evidentiary basis, Li merely speculates that the recording could have

been altered.  However, when it came time to cross-examine SA Chan as to any potential issues

during trial, defense counsel did not even bother asking the witness any questions.  Accordingly,

there was no reason for me to exclude the ITACC recording on authenticity grounds.

  **J.**  **Inaccurate Transcript**

Because the recording of the September 29 meeting contained multiple voices in English and two dialects of Chinese, the Government offered an English-translated transcript into evidence.  Before trial, both sides stipulated that this exhibit was a "fair and accurate English-language" translation of the events.  The Government then took this English translation and inserted them as subtitles in the video, so the jury could follow along when the recording was played in court.  Having obtained new counsel for the purposes of filing this motion, Li now claims the English transcript of this meeting was "fraught with errors."

As the Government points out, however, it is clear that Li's current counsel is reviewing a prior version of the transcript, which was never accepted into evidence.  Further, most of these "errors" also appeared on the transcript introduced at trial,[7] and thus Li waived any objection when his trial counsel stipulated to the transcript's authenticity and raised no objection when it was played in open court.  See United States v. Chiarizio, 525 F.2d 289, 294 (2d Cir. 1975) (stating the defendant's failure to raise an objection to the transcript in a timely manner or provide an alternate version of the transcript amounted to waiver).

An issue nonetheless arises because the older and unadmitted version of the transcript was inadvertently provided to the jury in a binder filled with other admitted transcripts.  During deliberations, the jury sent a note to the Court requesting four things: (1) the list of charges; (2) hard copies of the jury instructions; (3) the video recording of the September 29 meeting; and (4) transcripts of Pineda's phone calls, which were played by the Government at trial.  Notably, the jury did not request the transcript of the September 29 meeting (I only assume it was because

---

[7] On this point, Li claims the transcript contained two material errors: (1) it identified him speaking even though he purportedly had not even entered the room; and (2) since the transcript failed to establish which parties understood which languages, the jury was "given the impression that everyone underst[ood] what was being said in the room, regardless of the language [spoken]."  He contends this prejudiced his defense that he was pulled into the meeting to act as a translator at the last minute with no notice as to its purpose.

they preferred to watch the subtitled video).  Both sides agreed that the Government would
provide the jury with a laptop so it could review the September 29 subtitled video at its leisure.
But when the parties sent back a transcript binder of the admitted phone calls, the binder also
happened to contain both the stipulated transcript of the September 29 meeting, along with an
older version of the transcript.[8]

Although the older version of the exhibit was accidentally included in the trial binder, I
decline to grant defendant a new trial for three reasons.  First, the jury read the agreed upon
English subtitles while watching the video during the Government's case-in-chief.  Since it was
the first piece of evidence specifically requested by the jury in the note, it is fair to assume they
watched it again during deliberations.  Second, it would be entirely speculative to assume the
jury bothered to review the older version of the transcript, especially since they had just received
the requested recording with accurate subtitles.  They would have no reason to review a
transcript they did not even bother requesting.

Third, and perhaps most importantly, the only error in the older version that was not
included in the stipulated version, was immaterial.  Li claims that the older transcript twice
reflected that Pineda was speaking Chinese instead of English.[9]  His argument is as follows:
based on this error, the jury may have incorrectly believed that Pineda really did speak Chinese,
and thus this oversight undermined Li's entire defense that he was asked at the last minute to

---

[8] The Government represents it was unaware of this oversight during trial, as it only discovered this mistake while
preparing its opposition to defendant's instant motion.  The Court has no reason to question the Government's
representation.

[9] The transcript indicated that words originally said in Mandarin Chinese and Fuzhou would be in standard and
underlined text, respectively, while those spoken in English would be italicized.  In the older version, Pineda's
statements were in standard text on two instances, but otherwise correctly italicized throughout the rest of transcript.

merely act as Pineda's translator.  This resulted in the inference that Li's "true" presence at the meeting was unrelated to his language skills.

Defendant makes a mountain out of a molehill.  At trial, it was obvious that Pineda did not speak any Chinese: (i) Tony, who had to testify through an interpreter because of his very limited English skills, testified that Pineda did not speak Chinese during their conversations but spoke to him through Li, who acted as an interpreter the entire time; (ii) the jury heard Pineda speaking only English in the video and multiple phone calls; (iii) at no point in the meeting did Pineda give any indication that he understood Tony's words without first listening to Li's subsequent English translation; and (iv) Li was recorded on camera translating the entire September 29 conversation for Pineda and Tony, during which he was instructed, on multiple occasions, to translate for the group.  Further, in Pineda's recorded phone call with the FBI confidential source, the source asks Pineda if he will need a translator for his upcoming meeting with Tony.  In other words, it was never remotely suggested by any side that Pineda in fact understood any Chinese, and the Government consistently argued that Pineda needed Li to translate for him when speaking with Tony.  Therefore, the slight error contained in the older transcript does not warrant any relief.

The related argument that the Court erred by not providing a limiting instruction to the jury when the September 29 video was played in court also lacks merit.  As I noted above, the parties stipulated to one English-translated transcript (which became the subtitles) and thus there was no reason to inform the jury that it had a duty to determine whether a competing transcript was more accurate.  Cf. United States v. Ben-Shimon, 249 F.3d 98, 101 (2d Cir. 2001) (stating a limiting instruction is warranted when the parties disagree as to the context of the recording and submit competing versions of a transcript to the jury).

**II.      Whether injustice requires a new trial**

In the alternative, defendant seeks a new trial.  Fed. R. Crim. P. 33(a) provides that,

"[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the

interest of justice so requires."  Unlike the strict confines within which a court must examine a

defendant's Fed. R. Crim. P. 29 motion for a judgment of acquittal, a court has "broad discretion

in ruling on a new trial motion."  United States v. Canova, 412 F.3d 331, 348 (2d Cir. 2005)

(internal quotation marks omitted).  "In considering whether to grant a new trial, a district court

may itself weigh the evidence and the credibility of witnesses, but in doing so, it must be careful

not to usurp the role of the jury."  Id. at 348-49.  "The ultimate test is whether letting a guilty

verdict stand would be a manifest injustice… . There must be a real concern that an innocent

person may have been convicted."  Id. at 349 (internal quotation marks omitted).

"The trial court must be satisfied that competent, satisfactory and sufficient evidence in

the record supports the jury verdict."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir.

2001) (internal quotation marks omitted).  "The district court must examine the entire case, take

into account all facts and circumstances, and make an objective evaluation."  Id.  Courts

"nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary

circumstances."  Id. (intenral quotation marks omitted).

Defendant claims the Government failed to turn over exculpatory evidence about Tony's

unlawful immigration status in violation of Brady v. Maryland, 373 U.S. 83 (1963).  There are

three components to a Brady violation: (1) the evidence at issue must be favorable to the accused

either because it is exculpatory, or because it is impeaching; (2) the evidence must have been

suppressed by the Government, either willfully or inadvertently; and (3) prejudice must have

ensued.  See United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004).  To establish materiality, the defendant must show a "reasonable probability" that a different verdict would have resulted from the disclosure of the information that the defendant claims was suppressed.  See United States v. Cacace, 796 F.3d 176, 184 (2d Cir. 2015).  It is of course blackletter law that "*any* illegal conduct of a government witness can be considered probative of bias, on the theory that the witness is likely to curry the favor of government attorneys[,]" United States v. Atherton, 936 F.2d 728, 733 (2d Cir. 1991) (emphasis in original), so I will assume that this information had some impeachment value and focus on the second and third components to an alleged Brady violation.

As to whether this information was suppressed, the Government represents that it was in fact turned over to Li's former counsel before trial and Li does not dispute this representation in his reply.  Moreover, we know the Government turned over this information because, in his instant motion, Li cites the Government's own disclosures under the the the Jencks Act, 18 U.S.C. § 3500, as the basis for his knowledge that Tony's asylum application (which would have provided him lawful status) was indeed denied in 2005.  It is therefore plain that defendant was well aware of Tony's unlawful immigration status before trial and had ample opportunity to utilize such evidence at trial.  See United States v. LeRoy, 687 F.2d 610, 618-19 (2d Cir. 1982).

In any event, the victim's unlawful status was meticulously covered at trial.  On direct examination, Tony readily admitted that he lacked legal status in the country; had paid smugglers to get him into the United States through various countries using fake foreign passports; had been arrested by U.S. immigration officials once he landed in Chicago; had been denied asylum; and that, despite being denied lawful status, continued to reside in the United States.  When it came time for cross-examination, at no point did the defense ask for a sidebar or recess to

suggest it had been blindsided by this testimony.  Rather, what followed was a thorough cross-

examination by defense counsel, in which Tony's various criminal misdeeds, which went

unpunished by the Government pursuant to an immunity agreement, were amply fleshed out.

Because the jury was presented with Tony's unlawful status and, by extension, his potential bias

for the Government, defendant fails to demonstrate any requisite prejudice, which is fatal to his

Brady claim.  See Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

   Further, the argument that the victim committed perjury is likewise baseless since

defendant has failed to adduce any evidence that Tony testified untruthfully.  Rather, Li

speculates that Tony must have been a "regular" FBI informant and that he "likely" asked the

Government to help him obtain an informant or victim visa based on his cooperation in the

instant case.  But he provides no factual basis for this accusation beyond mere conjecture.  "As a

matter of law, mere speculation by a defendant that the government has not fulfilled its

obligations under [Brady] is not enough to establish that the government has, in fact, failed to

honor its discovery obligations."  United States v. Upton, 856 F. Supp. 727, 746 (E.D.N.Y. 1994)

(citing United States v. Driver, 798 F.2d 248, 250 (7th Cir. 1986)).  For this reason, courts

consistently reject such bald assertions.  See, e.g., Guerrero v. United States, No. 07-cr-248,

2017 WL 1435743, at *8 n.7 (S.D.N.Y. Apr. 20, 2017); Skinner v. Duncan, No. 01-cv-6656,

2003 WL 21386032, at *25 (S.D.N.Y. June 17, 2003) (collecting cases and holding that

conclusory, speculative allegations that the government failed to disclose evidence are

insufficient to support a Brady violation).

   I will now turn to whether the Government presented competent, satisfactory, and

sufficient evidence to support the verdict.  Having independently weighed the evidence and the

credibility of witnesses, I have no concern whatsoever that an innocent person was wrongfully

convicted.  As I noted above, I found the Government's case compelling.  Li was recorded on camera eagerly translating for Pineda and also caught laughing at the victim's plight after Tony told him he had been threatened by Pineda with a gun the day before.  Thus, Li's words and overall behavior during the September 28 and 29 meetings, once viewed in context with his pre-existing relationship with Pineda, leads me to the inescapable conclusion that he sincerely desired for Pineda's plan to extort Tony to succeed and had no problems using Pineda's threat of physical violence to ensure that this happened.

## III.    Ineffective Assistance of Counsel

The test for ineffective assistance of trial counsel claims is too well-established to require much discussion.  Briefly, to prove ineffective assistance of counsel, petitioner must meet the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  The first prong requires him to show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms."  Id. at 688.  I must apply a "strong presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did."  Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (citation and internal quotation marks omitted).  The second prong requires petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 669.  "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

Defendant advances five arguments as to why his trial defense team was ineffective: (1) they raised an "insufficient" oral Fed. R. Crim. P. 29 motion at trial; (2) failed to call a man named Ah Jun as a defense witness; (3) failed to object to phone records between defendant and

Brian White; (4) waited until trial to seek disclosure of the FBI confidential informant's identity; and (5) that his trial team "hardly objected" and made "unclear" objections.  None of these alleged deficiencies warrant any relief.

### A.    Rule 29 Motion

As to trial counsel's short oral Rule 29 motion after the Government's case-in-chief, there can be no prejudice because Fed. R. Crim. P. 29(c) permits a defendant to renew his motion, which he has now done.  Moreover, since I have denied his instant and more fulsome written motion, defendant cannot credibly maintain that the result of the proceeding would have been any different.  For the same reasons stated above, I would have most certainly denied a lengthy oral Rule 29(c) motion, even if it mirrored defendant's instant written motion.

### B.    Ah Jun's Potential Testimony

Trial counsel's decision not to call Ah Jun at trial was a strategic decision.[10]  The Second Circuit has repeatedly emphasized that "[t]he decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess."  Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005).  Thus, "counsel's decision as to 'whether to call specific witnesses – even those that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."  Id. (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000)).

For the purposes of this motion, Li's current counsel obtained a sworn affidavit from Ah Jun.  It states, among other things, the following: that he, not Pineda, was the majority owner of

---

[10] There was no need to require an affidavit from Li's trial attorneys.  Defendant states in his motion that he informed them of his desire to call Ah Jun at trial, that they interviewed him, but that they decided not to utilize him at trial.

the gambling parlor; that Pineda was his business partner and manager of the store; that he knew Li as a customer at his gambling parlor; that Li's physical presence at the parlor on both days was for an innocent purpose – he was there to do building renovations; that Li held no financial interest in the gambling parlor; that Ah Jun was the one who asked Li to help translate for the group when Tony arrived; and that Li did not know what the September 29 meeting was going to be about beforehand.

There are many issues with this affidavit.[11]  Foremost, Ah Jun does not explain how he was privy to Li's knowledge and state of mind that day.  Although he claims that Li did not know what the September 29 meeting with Tony was going to be about, this contention is specifically contradicted by Tony, who said that Li was present the day before when Pineda threated Tony with a gun while attempting to extort him.

More importantly, Ah Jun's testimony equally could have harmed Li's defense at trial. Ah Jun was implicated in Pineda's illegal gambling operation, and, like Tony admitted at trial, likely failed to pay federal or state taxes.  Plus, he stood to benefit from Pineda's attempt to extort Tony, and was present at the September 29 meeting.  In fact, Ah Jun was recorded instructing Li to translate the group's coercive demands and browbeating Tony to pay Pineda 10% of his monthly proceeds.  In other words, Ah Jun was essentially an unindicted co-conspirator and would have likely incriminated himself at trial (and taken Li down with him).  At no point in his affidavit does Ah Jun state that he was willing to testify or that he would have waived his right against self-incrimination if called by the defense.

---

[11] Ah Jun states that he speaks and reads "some English" and that defendant's current counsel served as the translator for the affidavit.  Ah Jun claims that he was present with Li in September 2019 – even though the events at issue transpired in September 2017.  Also, the original Chinese affidavit was never provided to the Court.

Even if Ah Jun chose to testify (which I highly doubt based on his own criminal exposure), the result would have been a scathing Government cross-examination as to Ah Jun's own state of mind, criminal behavior and bias.  Since he was Pineda's business partner in an illicit gambling parlor, the implication would have been that Ah Jun was either involved with or condoned Pineda running a drug operation out of their joint business.  It would have been pretty incredible to claim ignorance.  Moreover, we should not forget that Ah Jun was also caught on video bursting into laughter when Tony told the group how scared he was after Pineda pulled a gun on him the day before.  Despite this disturbing comment, Ah Jun nevertheless continued to browbeat Tony into accepting Pineda's coercive offer.  I therefore cannot see how any jury would have looked favorably on Ah Jun's own actions that day and, by implication, upon Li.

There is also a high degree of certainty that the Government would have extracted damning admissions from Ah Jun at trial.  Why was Ah Jun in the room?  Did he know of Pineda's plan to extort Tony?  If he didn't, what was he doing there?  As a part-owner of the gambling parlor, Ah Jun also had a financial interest to make sure Pineda's extortion attempt succeeded.  And he was caught on camera doing everything he could to make sure it did.  Further, his testimony would have largely corroborated Tony's account by placing Li with Pineda on both September 28 and 29, 2017, and confirming that Li acted as Pineda's translator on both occasions.

And, by referring to Li as a regular customer at his gambling parlor, Ah Jun would have partially corroborated Ms. Yun's testimony that Li frequented Pineda's establishment, borrowed money from Pineda to gamble there, and also purchased meth there.  Since Ah Jun's testimony could have been exploited by the Government to prove Li's gambling problems, this would have also served as circumstantial evidence as to Li's financial motive to obtain drugs with the intent

to distribute and reason to aid and abet in Pineda's extortion of Tony: Pineda was Li's drug

supplier and loanshark.  Li therefore had every reason to curry favor with Pineda, especially

since the latter had advanced Li substantial amounts of drugs without requiring initial payment

and would regularly loan him money to gamble.

At best, having Ah Jun testify for the defense was a double-edged sword – one that could

have surely fallen swiftly and violently upon defendant. In fact, I think an ineffective assistance

of counsel claim stood a greater chance of succeeding had counsel indeed called such an

inculpatory and easily impeachable witness.  I therefore cannot fault trial defense counsel's

sound strategic decision not to hang his hat on a witness so closely associated with Pineda and

the September 28 and 29 meetings – the very person and incidents from which defendant spent

the entire trial trying to distance himself.

### C.    Defendant's Call Logs with Brian White

Li also alleges that his trial counsel were ineffective for failing to raise a timely and

specific objection when the Government introduced his call logs with Brian White.  Li had

communicated with White around the same timeframe Li was accused of buying drugs from

Pineda.  It was also disclosed during trial that White was a drug user and dealer.  It is true that

trial counsel did not make a timely objection at trial when the exhibit was first offered by the

Government.  The exhibit was accepted into evidence for the limited purpose of corroborating

Ms. Yun's testimony that White had introduced Li to Pineda.  After the exhibit was shown to the

jury, however, trial counsel lodged a belated objection citing Fed. R. Evid. 401 and 403.  After

conducting a balancing test under Rule 403 on the record, I overruled the objection.

At the same time, I offered to provide a curative instruction that the jury should not draw

a negative inference that there was any drug dealing between White and Li.  Trial counsel

declined my offer for fear that this would draw unnecessary attention to the matter.  This rejection of the Court's offer of a curative instruction, which would have "called [the harmful evidence] to the attention of the jurors," should be "considered sound trial strategy."  Williams v. Donnelly, No. 00-cv-4445, 2005 WL 2290592, at *31 (E.D.N.Y. April 12, 2005) (citing Strickland, 466 U.S. at 689); see also United States v. Nolan, 956 F.3d 71, 83 (2d Cir. 2020) (stating effective counsel might elect not to seek a limiting instruction because this may call the jury's attention to the harmful evidence).  In any event, since Li was acquitted of the sole drug charge, I cannot see how evidence associating him with a known drug user and dealer could have resulted in any prejudice to defendant.

### D.      Identity of the FBI Confidential Informant

Likewise, counsel's failure to seek disclosure of the CI's identity did not amount to ineffective assistance of counsel.  The CI was the unidentified person who used the FBI ITACC system to covertly record his telephone call with Pineda.  He captured Pineda bragging about threatening Tony: I should have "f----- them up last night," and Tony "better close the m-----f---- store [if he does not pay]."  The CI, who apparently spoke Chinese, then offered to translate the next time Pineda met with Tony.

In a single sentence in his motion, Li criticizes his counsel for failing to obtain the CI's real name from the Government.  But he otherwise fails, once again, to advance any reasoned argument why this mattered for the purposes of trial and what prejudice he supposedly suffered. I cannot see why knowing the source's name would have made any difference.  Pineda's own damning admissions formed the crux of this exhibit, and the CI's statements merely provided context.  There was also no genuine dispute as to the recording's authenticity.  The CI did not

need to lay the foundation for the recording at trial because the Government offered the exhibit as a business record, which an FBI agent authenticated.

Assuming *arguendo* that counsel obtained the CI's identity before trial and was able to use this information to severely undermine the phone call's reliability, I do not see how this would have led to a different outcome.  Had the jury decided to disregard the evidence gleaned from this particular call due to the source's credibility issues, there was ample residual evidence from which the jury could find that Pineda threatened physical violence against Tony in furtherance of a plan to extort him.  Tony testified that Pineda threatened him with a gun, and this allegation was corroborated by the video from the September 29 meeting, in which Pineda failed to deny the accusation and merely laughed at the comment.  Further, the video revealed how both Pineda and Li repeatedly attempted to intimidate Tony.  I therefore cannot find that "the likelihood of a different result would have been substantial."  Harrington, 562 U.S. at 112.

Defendant also argues that, by failing to identify the CI, trial counsel left the jury with the impression that Li was in fact the CI and had offered to translate Pineda's next meeting with Tony knowing full well of Pineda's plan to extort him.  It stretches imagination to think that the jury would have wholly disregarded substantial portions of trial and come to this bizarre conclusion.

First, both the Court and the jury heard Li's distinct voice and speech patterns captured by Tony's hidden camera, and it was obvious that the CI's voice and speech patterns were different from Li's.  Based on the evidence presented at trial, no one could reasonably conclude that the two were the same people.  Second, the transcript for this particular phone call identified the speaker as an FBI "Source," while the other introduced transcripts readily identified Li whenever he was speaking.  The jury could therefore reasonably conclude that the two were

distinct individuals.  Third, the FBI Agent testified that the CI would have to call an FBI phone number to activate the automated recording system, thereby making the conscious decision to record the phone call on the FBI's behalf.  It is absurd to think Li would intentionally record an inculpatory phone call for the purpose of providing it to law enforcement.  Lastly, the Government never suggested that Li was the CI.

### E.      Trial Counsel's Objections

Defendant's argument that his counsel "hardly objected" is belied by the record because he only refers to specific instances in which a timely objection was raised and the Court made a ruling.  Beyond the conclusory and vague assertion that his counsel should have objected more, defendant fails to direct the Court towards any precise question or piece of evidence to which his trial counsel failed to make an objection and the resulting prejudice he suffered.  This is fatal to his claim.

Finally, the fact that the Court had to admonish trial counsel on a single occasion for his "offensive" and "angry" tone when making objections does not establish ineffective assistance of counsel because there was no prejudice.  This exchange occurred at sidebar, so the jury was not privy to this conversation and thus could not have been influenced by the Court's admonition.  In any event, the Court provided the standard instruction that the jury should not bear any prejudice against any attorney or party if the attorney made an objection and that the personalities and conduct of counsel were not to influence their deliberations.  Since the jury acquitted Li on half of the counts, it is safe to say that they did not hold his counsel's tone against him.  See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence …, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions.").

37

## CONCLUSION

Defendant's motion for a judgment of acquittal or, in the alternative, a new trial, is

denied.

**SO ORDERED.**


_____
U.S.D.J.

Dated: Brooklyn, New York
       November 2, 2020